**RHODES v. JORDAN, Sheriff, et al. ***
No. 4891.

Court of Appeal of Louisiana.
Second Circuit.
Dec. 5, 1934.

---

*Rehearing denied January 9, 1935.

Rehearing denied: MILLS, J., dissenting.

Bertram V. Barnette, of Arcadia, and Chris Barnette, of Shreveport, for appellant.

Hardin & Coleman, of Shreveport, for appellees.

DREW, Judge.

Due to the seriousness with which defendants urge the exception of no cause of action

in this court, we feel that it is advisable to quote the petition of plaintiff, with the exception of the prayer. It is as follows:

"The petition of Alfred M. Rhodes, a resident of the Parish of Bienville, State of Louisiana who with respect represents:

"1. That Henderson Jordan is the duly elected, qualified and acting Sheriff of Bienville Parish, Louisiana, and was so during the month of October, 1932, and that the said Henderson Jordan, Sheriff of Bienville Parish, Louisiana, and Sun Indemnity Company of New York, New York, a foreign insurance corporation doing business in the State of Louisiana, are justly and legally indebted unto your petitioner in solido in the full and just sum of $10,245.85, with legal interest thereon from date of judicial demand until paid, and all costs of this suit.

"2. Your petitioner alleges that on or about the 10th day of October, 1932, while he was at his home about three miles southwest of the Town of Gibbsland, Louisiana, Henderson Jordan, Sheriff of Bienville Parish, Louisiana, and P. M. Oakley, his duly authorized deputy, Dave Armstrong, Night Marshal for the Town of Gibbsland, and A. D. Williams, Day Marshal of the Town of Gibbsland, came to his home and accused him of having been drunk and disorderly and with disturbing the peace in the town of Gibbsland on or about the 8th day of October, 1932, and told your petitioner that he would have to pay a heavy fine for it unless he would assist the Sheriff of Bienville Parish and his deputies in apprehending the 'bootleggers' and 'moonshiners' from whom he had obtained his whiskey, and assured him that if he would disclose their identity and point out the location of the stills to the Sheriff, no charges would be lodged against him, and then told him to 'think the proposition over' and they would return in a few days for his answer.

"3. That on or about the night of October 22, 1932, your petitioner was in the town of Gibbsland and that in the early part of the night or late afternoon, said Dave Armstrong, Night Marshal for the Town of Gibbsland, asked your petitioner if he was ready to go with him and the 'Sheriff' to point out the location of the stills and disclose the identity of the bootleggers and moonshiners, but that your petitioner answered that it was impossible for him to go at that time. Whereupon, said Dave Armstrong called by telephone P. M. Oakley, Deputy Sheriff of Bienville Parish, Louisiana. Whereupon said P. M. Oakley came to Gibbsland and told your petitioner that he was ready to go after the bootleggers and moonshiners and that your petitioner

must go with him, to which your petitioner protested. But notwithstanding his protest, the said P. M. Oakley, Deputy Sheriff, acting in his official capacity, compelled your petitioner to get in his automobile and go with him and that your petitioner did get in the automobile with the said P. M. Oakley, Deputy Sheriff, and said Dave Armstrong, which was against your petitioner's will, and that he did so only upon order and command of the said P. M. Oakley, Deputy Sheriff.

"4. That the said P. M. Oakley, Deputy Sheriff, put your petitioner in the automobile with him and the said Dave Armstrong and drove away from the town of Gibbsland, out what is known as the Oak Grove Road and that he, the said P. M. Oakley, Deputy Sheriff, acting in his official capacity, told your petitioner again that if he would point out the location of the stills and disclose the identity of the bootleggers and moonshiners, that he would not be prosecuted, but that if he failed to do so, he would be prosecuted and subjected to payment of a heavy fine and a jail sentence, and that your petitioner was then under arrest and forced to accede to the demands of the said P. M. Oakley, Deputy Sheriff, acting in his official capacity.

"5. That the said P. M. Oakley drove the automobile in which they were riding somewhere on the Oak Grove Road and let the aforesaid Dave Armstrong get out of the car. Whereupon he immediately proceeded to Bryceland, where he got one T. H. Taylor, duly authorized and empowered Deputy Sheriff of Bienville Parish, Louisiana, acting under the official direction of the said Henderson Jordan, Sheriff of Bienville Parish, and that the said P. M. Oakley and T. H. Taylor were then and there acting in the discharge of their duties as deputy sheriffs and that they acted as agents, employees and authorized deputies of the said Henderson Jordan, Sheriff of Bienville Parish, and that their said acts were the official acts of the said Henderson Jordan, Sheriff.

"6. That the said P. M. Oakley operated a Ford Sedan automobile owned and used by Henderson Jordan, Sheriff of Bienville Parish, in his official duties and that same was operated by said P. M. Oakley, Deputy Sheriff, in the discharge of his duties as aforesaid, and that your petitioner occupied the front seat of said automobile, which was driven by said P. M. Oakley and that the said T. H. Taylor, occupied the rear seat of said automobile.

"7. That your petitioner was then under arrest and in the custody of Henderson Jordan,

Sheriff of Bienville Parish, who was acting through the said duly authorized and empowered deputies, P. M. Oakley and T. H. Taylor.

"8. That your petitioner was taken in said automobile to the vicinity of Black Lake, where he attempted to locate a still and its operators, upon order, threat of prosecution if he failed to do so, and promise of reward for so doing, made by said deputies, but that he was unable to locate same and that he, in company with said deputies as aforesaid drove back toward the town of Gibbsland, in Bienville Parish, over what is known as the Oak Grove Road.

"9. That as they neared the town of Gibbsland, it being somewhere near midnight, your petitioner objected to the manner in which P. M. Oakley drove and operated the automobile in which they were riding and particularly did he remonstrate with said Oakley about the dangerous rate of speed, at which he was driving, and further told said P. M. Oakley, who was driving said automobile, as above alleged, that the road was very hilly and crooked and that he had better watch out for the curves and hills, but that, notwithstanding his protest, the said Oakley continued to drive said automobile in a very careless, reckless, dangerous and negligent manner.

"10. That at a point approximately two miles from the town of Gibbsland, on said Oak Grove Road, at which point being very hilly and crooked, your petitioner again protested against the manner in which said Oakley operated said automobile and made the remark to said Oakley that he had better be careful going over that hill because there was a curve just over the top and that he was afraid the car would be wrecked.

"11. That the said Oakley ignored his protest and continued to drive the automobile in a very careless, reckless and negligent manner and that as he approached and mounted the crest of the hill, the head lights on the automobile reflected up and off said road in such manner that the said Oakley apparently did not see the curve about which your petitioner had just warned him and that the said Oakley did not follow the road around the curve, but drove off the road and into the ditch alongside.

"12. That at the time said Oakley was driving said automobile at a very rapid rate of speed, approximately 60 miles an hour, over the protest of your petitioner, and that because of his excessive speed, gross carelessness and negligence, said automobile was wrecked and that in some manner, unknown to your petitioner, he was thrown out of the automobile, and fell into the highway, inflicting serious and permanent injuries more particularly set forth hereinafter and that said automobile ran into the ditch alongside the road and turned over.

"13. That the force with which your petitioner was thrown out of said automobile into the road was so great and the impact with which he struck the road was so great that he was seriously and permanently injured, more particularly, that your petitioner sustained a cortical fracture of the upper anterior border of the body of the eleventh dorsal vertebra, with the resulting lipping of the lumbar vertebra and calcification in the lateral ligaments around same.

"14. That said injuries were very painful and are at present the source of great pain to him and that same are permanent and render him incapable of ever, during the balance of his natural life, performing any manual labor.

"15. Your petitioner alleges that he was at the time of said injury 48 years of age and that he was a farmer and that in the course of his business he performed manual labor; that he is not prepared for the performance of any other kind of work for a livelihood and that since he has been permanently and totally disabled from performing the manual labor incident to the exercise of his business as a farmer, he has suffered great damage, as is more fully shown hereinafter.

"16. For treatment, T. E. Schumpert Memorial Sanitarium, Shreveport ............... $117.75
Supplies for treatment....... 1.55
Dr. B. C. Garrett............ 100.00
Dr. O. L. Kidd.............. 25.00
Wilson Drug Company....... 1.55

"17. Your petitioner alleges that his damage is as follows:
Hospital, doctor's bill and medical supplies, as above alleged ................. $ 245.85
Pain and suffering........ 2,000.00
For permanent total disability .................. 8,000.00

Total .................... $10,245.85

"18. That said injuries were the direct result of the gross carelessness and negligence of P. M. Oakley, Deputy Sheriff, acting in the discharge of his orders and duties from Henderson Jordan, Sheriff of Bienville Parish, Louisiana, as above alleged, and that his acts

of negligence were those of his principal, the said Henderson Jordan, Sheriff of Bienville Parish, who, at the time of the infliction of said injuries upon your petitioner, was acting officially in the discharge of his duties as Sheriff of Bienville Parish, Louisiana.

"19. Your petitioner is informed and believes and alleges as a fact that the Sun Indemnity Company of New York, issued a policy of public liability insurance, insuring Henderson Jordan, Sheriff of Bienville Parish, against loss on account of injuries sustained by reason of his acts of negligence or those of his deputies in the operation of this aforesaid Ford Sedan automobile; that your petitioner has no knowledge of the provisions of said policy of insurance other than as above alleged; that he does not have a copy of same and is unable to annex same hereto.

"20. That by virtue of Act No. 55 of the Legislature of the State of Louisiana, for the year 1930, said Sun Indemnity Company of New York, New York, is liable to your petitioner in solido with said Henderson Jordan, Sheriff of Bienville Parish, Louisiana, for the damage herein alleged and by authority of said act is made a party defendant herein.

"21. Petitioner further alleges that amicable demand for settlement has been made in vain."

To this petition defendants filed an exception of no cause of action, which was overruled by the lower court. They then filed an application for rehearing on the exception, which was likewise overruled. In their answers, defendants admitted the date of the accident and the issuance of the policy, but denied all other allegations of plaintiff's petition. Further answering, defendants alleged that there was an agreement between the plaintiff and Henderson Jordan, sheriff, whereby the plaintiff agreed to locate certain stills in the vicinity of Black Lake, Bienville parish, La., for the consideration of $10 per still and that, acting under this agreement and employment, plaintiff and his deputies, Mr. Oakley and Mr. Taylor, drove to the vicinity of Black Lake on the night of October 22, 1932, where they made an unsuccessful search for stills, and were returning to Gibbsland at the time of the accident. Defendants further alleged that the accident was caused through no fault or negligence on the part of Mr. Oakley, the operator of the car; that plaintiff and Oakley were on a joint enterprise and mission at the time of the accident, and, if Oakley was negligent, then such negligence is chargeable and imputed to plaintiff.

Further, in the alternative, defendants alleged that plaintiff was more familiar with the road on which they were traveling than Mr. Oakley was; that plaintiff was directing the course of the searching party and the automobile trip, but failed to warn Oakley of any dangerous curve or place in the road and, instead of protesting against the speed at which the car was being driven, plaintiff remained silent and acquiesced in such speed; that by virtue thereof, plaintiff was guilty of contributory negligence and such negligence was a bar to his recovery.

The Sun Indemnity Company set up two additional defenses; first, that the policy excludes the employee of the assured from insurance protection, and that plaintiff was an employee of Henderson Jordan on the night of the accident; that by reason thereof, the insurance company in no event is liable to the plaintiff; and, second, that the policy does not protect the assured against any claim based on any workman's compensation agreement plan or law, and that the relationship of an employer and employee, within the meaning of the Workmen's Compensation Law (Act No. 20 of 1914, as amended), existed between the plaintiff and Henderson Jordan, sheriff, on the night of the accident, and that by reason thereof the insurance company in no event is liable to the plaintiff.

The case was tried in the lower court on these issues and the demands of plaintiff rejected, at his cost, from which judgment plaintiff has perfected an appeal to this court.

Defendants seriously urge in this court the exception of no cause of action. They contend that the act complained of must have been committed while in the actual performance of an official act and must have resulted from the manner in which said official act was performed to make defendant sheriff liable, and that the actual arrest of the suspected violator of the law is an official act; that the traveling to or from the place where the official act is to be performed is not part of the official act. McVea v. Day, 6 La. App. 382; Sanders v. Humphries et al., 143 La. 43, 78 So. 168, 169.

The McVea Case, as well as the Sanders Case, was decided as exceptions of no cause of action must be, that is, on the face of the petition. In each of the cases the courts held that the petition did not disclose a cause of action for the reason that the petition merely set forth conclusions of law and not facts. In the McVea Case, the First Circuit Court of Appeal of this state said in conclusion:

"Our conclusion is that, in order to hold a sheriff liable for a wrong committed by his deputy, such wrong must have been committed while in the actual performance of an official act, that such wrong must be directly connected with and because of an official act and must have resulted from the manner in which such official act was performed. Of course, in this case there is no question of failure to perform an official duty; the complaint is that Duhon committed a wrong while acting in an official capacity."

However, this part of the opinion was unnecessary to a determination of the case, it having been held in the same opinion that the petition only set forth conclusions of law and not facts, for a cause of action.

In the Sanders Case, decided by the Supreme Court of this state, the court said:

"The liability of the surety in th's case, therefore, depends upon whether the plaintiff has alleged sufficient facts to show that the deputy sheriff violated, or failed to perform faithfully, a duty required of him by law. The surety is liable as well for a deputy sheriff's violation of an official duty, or for his failure to perform such duty faithfully, as for the sheriff's violation, or failure of faithful performances of official duty. But neither the sheriff nor the surety on his official bond is responsible for a wrongful act of a deputy sheriff unless it was done in violation or in an unfaithful or improper performance of an official duty.

"The allegation that the reckless assault and shooting were done while Humphries was on duty as a deputy sheriff, and while he was acting as a deputy, agent, servant and employee of the sheriff, is not the same as to say that the acts were done in violation or in an unfaithful or improper performance of an official act.

"In so far, however, as those allegations might be construed to mean that the assault and shooting were the result of a reck'ess performance of an official act of the deputy sheriff, the allegations manifestly express only the opinion or conclusion of the plaintiff in that respect. And that opinion or conclusion is, in effect, contradicted by the further allegation that the assault and shooting were done maliciously. Without any allegation of fact from which the court or jury might judge whether the wrongful act of the deputy sheriff was done in the performance of an official act, the petition does not disclose a cause of action against either the sheriff or the surety on his official bond."

In the case at bar, plaintiff set out facts which show, when taken as true, that he was actually under arrest by the sheriff of Bienville parish and in his custody at the time of the accident, which accident was caused by the negligence of the deputy sheriff. He clearly alleged a reckless performance of an official act by the deputy sheriff. He alleged facts in detail and not conclusions of law. The allegations of the petition as above, we think, when taken as true, clearly set forth a cause of action against the defendants. The petition sets forth that the deputy sheriff was in the act of discharging his official duty at the time of the accident. It does not allege that he was on his way to a place where an official act was to be performed. We cannot, however, agree with our brothers of the First circuit in the strict construction and interpretation of what constitutes an official act. If a deputy sheriff is sent into the country a distance of ten miles from the courthouse for the express purpose of arresting one who has committed murder, he is, in our opinion, performing an official act from the time he leaves until his return with the prisoner. It would be carrying the interpretation of "official act" to the absurd to hold that an officer in the late hours of the night, searching for illicit distillers of intoxicating liquor, was not performing an official act unless he actually caught the illicit distiller, and then his acts became official only at the very moment of making the arrest. The deputy sheriff was either acting in his official capacity or in his individual capacity, and it cannot be said he was acting in his individual capacity; therefore, his acts were necessarily official acts. We might go further and cite the law, which is that an officer of the law only has the right to bear concealed arms when in the performance of official duty, therefore, if in traveling to a distant point to make an arrest, an officer was not in the performance of an official duty, he would necessarily be forced to go unarmed, a situation which we feel sure will not be contended for as law by any court.

We conclude that the lower court was correct in overruling the exception of no cause of action.

■ Defendants contend that plaintiff was an employee of the sheriff on the night of the accident and therefore, under the following provision of the policy of insurance, to wit, "this policy does not cover loss or liability for, or any suit based on, injuries or death suffered by an employee of the assured arising out of and in the usual course of the trade, business or occupation of the assured,"

the insurance company is not liable. The facts relating to said alleged employment are as follows:

On a Saturday night, ten or twelve days prior to the date of the accident, plaintiff got drunk in the town of Gibbsland, Bienville parish, and committed several violations of the town's laws. He succeeded in getting out of town before being apprehended by the town's police officers and went to his home, several miles outside of town. Mr. Williams and Mr. Armstrong were the town's police officers. On Monday morning following, Mr. Armstrong telephoned to the sheriff, defendant herein, and requested him to come to Gibbsland, which he did, in company with his deputy Mr. Oakley. The sheriff related what occurred after reaching Gibbsland in the following language:

"* * * They told me that Mr. Rhodes had been drunk on the Saturday n'ght before that in Gibbsland and had gotten out of town and they wanted to go down there and get Mr. Rhodes and see him, in other words, Mr. Williams and Mr. Armstrong said that they had some charges against Mr. Rhodes there in Gibbsland, that they also had quite a bit of trouble with whiskey and drinking around Gibbsland, and if Mr. Rhodes would agree to help catch some stills and bootleggers there, that they were willing to drop those charges against him in Gibbsland, on this condition we went out to see Mr. Rhodes, that's why we went out there. So when we got out there I stated what Mr. Armstrong and Mr. Williams had agreed to do with Mr. Rhodes. Mr. Rhodes at first didn't seem to want to do it, he said he would make his neighbors sore at him. Some of them out there, I think Mr. Williams or Mr. Armstrong, said if he didn't do it, he would have to pay this fine at Gibbsland, so Mr. Rhodes asked me then what there was in it if he caught these stills for me and I agreed to give him $10:00 for each still that he caught. At that time he said he also knew of a truck passing through hauling some 500 gallons of whiskey and at which time I offered him $50.00 if he would place the truck or let me know when this truck come through so I could catch it."

He further stated the reason he went to plaintiff's house was because plaintiff was out of the jurisdiction of the town marshal of Gibbsland and said officer had sought his assistance as the executive officer of the parish in apprehending plaintiff, who was outside the city limits; that he went in his official capacity. He further testified that plaintiff,

in replying to the proposition made to him in regard to assisting in locating stills and catching bootleggers, said, "I will think it over and let you know." The sheriff never saw plaintiff again and never heard from him again in regard to the proposition he had made.

The sheriff further testified that on the occasion that he went to plaintiff's house with the Gibbsland officers, he went there to arrest plaintiff for the Gibbsland officers and would have done so had not the proposition been made to secure the assistance of plaintiff in catching bootleggers. He further testified that his deputy Mr. Oakley, who was driving the car at the time of the accident, made arrests and apprehended law violators with his, the sheriff's, authority and approval, and, in doing so, Mr. Oakley acted in his stead and as his duly authorized and empowered deputy and that Mr. Oakley's official acts were the sheriff's official acts. He testified that the car driven by his deputy Mr. Oakley, on the night of the accident, belonged to the sheriff's office and was used by him and Mr. Oakley for official duties; that the car was being used the night of the accident by Mr. Oakley in the discharge of his official duties.

Mr. Oakley testified that he did not see plaintiff from the time the proposition to assist in catching bootleggers was made to him until about ten nights later. He stated that on that night he was called by Mr. Armstrong, the Gibbsland officer, and, in response, went to Gibbsland where he found Mr. Armstrong and the plaintiff, both of whom got in the automobile, plaintiff on the front seat and Armstrong on the back. Armstrong stated to Mr. Oakley that plaintiff was ready to show him some stills. Armstrong then left the car. Mr. Oakley and plaintiff then drove to Bryceland, Bienville parish, La., and picked up another deputy sheriff, a Mr. Taylor. They then drove in the direction of Black Lake, as far as they could go in the car. From there they went into the swamp, led by plaintiff. No stills were found and it is very evident that plaintiff led the party out into the swamp and briar patches until they became lost, and, after several hours, they found their way back to the car and started back toward Gibbsland. On the way back, the accident occurred.

Mr. Oakley testified that he did not ask plaintiff if he had accepted the proposition made by the sheriff. He did not suggest paying plaintiff anything and plaintiff made no reference to the proposition on the entire trip.

When asked why he was taking plaintiff back to Gibbsland when he lived south of there several miles, he replied that he had left word with Mr. Armstrong to have the sheriff meet him at Gibbsland on his return, and that was his reason for going there. Mr. Oakley, when recalled to the stand by defendants, was asked on cross-examination the following questions:

"Mr. Oakley, isn't it a fact that it was your understanding and that of Mr. Rhodes (the plaintiff) and Mr. Armstrong and Mr. Jordan, the Sheriff, and Mr. Williams, that unless you found some stills down there and somebody was apprehended as bootleggers and moonshiners, that Mr. Rhodes was going to have to answer to these charges? A. Yes, sir.

"Q. That did not apply to that particular night? A. No, sir."

He further testified that he understood the charges were to be pressed if plaintiff did not locate some stills.

Plaintiff's version of the reason he, went with the deputy sheriff the night of the accident is as follows:

"On Monday morning after Saturday night, Mr. Henderson Jordan, Mr. Oakley, Mr. Dave Armstrong and Mr. A. D. Williams came out and told me that they had three or four charges against me and I would have to do something about it and told me if I would help them spot some bootleggers and help them fix some way to get hold of them, they would dismiss all of these charges against me. I was afraid to take anything like that. I didn't have any way getting by any other way and didn't have any money to pay my fine and finally I told them I would do what I could to keep from paying a fine or going to jail and so I think it was about, I don't know how many days, I was there in Gibbsland and Mr. Armstrong phoned Mr. Jordan to come over and Mr. Oakley came up there and told me he was ready to go out and get them, and I didn't want to go but, of course, I had to go and we went from there to Bryceland to get Mr. Taylor. I never seen the man before. And then we come back to Mt. Lebanon where Mr. Traylor's grist mill is and took the left and, come to my house and told my wife where we were going. And we went on the George Shaffer place and side-tracked the car and went down back of the Lary field on Black Lake and came up the Lake and seeing if we could locate the still and failed to find any and come back and got in the car and pulled back on the highway and on our way back to Gibbsland when we rounded the stiff

curve close to Coleman College, the car turned over. * * *

"Q. At the time the Sheriff came out there, Mr. Jordan, I believe you testified came out to see you, what did he say to you, state whether or not they said they were going to do anything if you didn't do something? A. Said they had three or four charges against me and I would have to do something, that they would be brought up in court if I didn't do something to get them dismissed.

"Q. Did you consent at that time or what did you do? A. I didn't want to do that. I didn't want to take no kind of job like that. I didn't want to settle it in that way. But in a condition like I was in, I was forced to do that.

"Q. After that you actually went? A. A few days after I went.

"Q. Now, where did you get in that car? A. In the road side of the Masonic Hall.

"Q. Where? A. Gibbsland.

"Q. Why did you get in there? A. Mr. Oakley came from Arcadia up there and said he was ready to go, to go locate them.

"Q. Did you just promptly get in there? A. It was against my will, but I had to go to keep from going to jail or paying a fine.

"Q. I might ask you if that's just the reason you got in there? A. That's the reason. I wouldn't have got in there if there had been any other way out of it. * * *

"Q. Mr. Rhodes, on the night you got in the car with Mr. Oakley, why did you get in the car or go with him? A. I got in the car to go with him to get rid of the charges they had against me. It was either that or have to be locked up. I didn't have no way to pay my fine. It was just lay it out in jail.

"Q. Did you protest going with him? A. I didn't want to go, but it was that or else.

"Q. What did he say to you? A. Said he was ready to go.

"Q. After you protested what did he then say? A. All he said was he was ready to go and said he would go and pick them up.

"Q. Did you know that Mr. Oakley was deputy sheriff at that time? A. Yes, sir.

"Q. Did he say he was acting under the orders of the Sheriff? A. He didn't tell me, but I knew he was. * * *

"Q. Well now, did Mr. Oakley tell you when he picked you up at Gibbsland that night that you were under arrest? A. He didn't say.

' Q. Well, why did you allege that in your petition? A. I supposed I was under arrest

until I fixed some way to get away from the charges.

"Q. I didn't ask you what you supposed, I asked what Mr. Oakley told you? A. He didn't say I was under arrest. * * *

"Q. Mr. Rhodes, you said in your testimony that you supposed you were under arrest, what fact caused you to suppose that?

"Object'on: By Mr. Coleman: Objected to because it calls for the opinion of the witness and isn't a fact.

"Ruling: By the Court: Objection overruled.

"A. We'l, I don't know whether you call it under arrest or not, they said I would have to do something to get that off of my hands and as soon as I done something they made me that proposition if I wou'd help them it wou'dn't ever be brought up against me any more. They would have handled me unless I done something.

"Q. Would you have gone with them if they hadn't made you that proposition? A. No, sir. I wou'dn't."

Neither Mr. Williams nor Mr. Armstrong test'fied in the case.

From the above-stated facts, it is evident that the relationship of employer and employee did not exist between the sheriff and the plaintiff in this case, and, further, that the sole and only reason plaintiff accompanied the deputy sheriff on the night of the accident was to prevent the charges against him from being pressed, which would have meant that he would be forced to spend a while in jail.

██ We think it immaterial whether the charges were for violating the laws of the town of Gibbsland or of the state, for it is evident that the sheriff and the town officers of Gibbsland were working together and that the sheriff, with the full consent and help of the town officers, was using the town charges against plaintiff to coerce him into acting as a "spotter." It was no violation of the town's laws (Gibbsland) for one to operate an illicit still outside the corporation limits; however, it was a violation of the state law and a law the sheriff was duty bound to attempt to enforce. It is also evident that the sheriff was willing to use his office to arrest a violator of the town laws when said violator was at the time outside the limits of the town and beyond the jurisdiction of its officers. The town officials and the sheriff's department were clearly working together with

a full understanding as to what they would require of plaintiff in order for the charges against him to be dropped.

██ ██ Another defense urged is that Deputy Sheriff Oakley and the plaintiff were on the night of the accident and at the time of the accident engaged in a joint adventure. To constitute a joint adventure, the occupants of the car, to wit, Oakley and plaintiff, must have had equal rights to control the operation of the car. This condition did not exist between plaintiff and Deputy Oakley. Lorance v. Smith, 173 La. 883, 138 So. 871.

Mr. Oakley correctly stated in his testimony that he was driving on his own responsibility and own lookout; that he had full charge of the car. It would be indeed unreasonable to think that one who had been coerced under threat of jail sentence to accompany a deputy sheriff on a search for an illicit still, and on the return trip, after failing to locate the still, and while being taken to meet the sheriff for further orders, would be given by the deputy sheriff an equal right with him to control the operation of the car.

We conclude therefore that there was no joint adventure.

██ ██ The last defense set up is that of contributory negligence on the part of plaintiff. This p'ea is an affirmative plea and the burden is upon the defendants to produce evidence to sustain it. The plea is based upon the alleged fact that plaintiff was familiar with the road and Mr. Oakley, the driver of the car, was not; that plaintiff was riding on the front seat with Mr. Oakley and did not protest as to the speed the car was making. The testimony of plaintiff is positive and direct. He testified that he warned Mr. Oakley, not once, but twice, about a curve at the top of a hill where the accident occurred, and told him that he could not make it traveling at the speed he was at the time of the warning. To contradict plaintiff's testimony, defendants offered the evidence of the driver of the car, Mr. Oakley, and the other deputy, Mr. Taylor, who was occupying the back seat. The most that can be said for their testimony on this point is that it is negative, in fact, it hardly amounts to negative testimony. The testimony of Mr. Oakley on this point is as follows:

"Q. Mr. Rhodes has testified that he asked you to slacken your speed, that you were going too fast over those hills, what have you to say as to that testimony of his? A. Mr. Coleman, if he said that I didn't hear him. I don't recall him saying that.

"Q. He testified that he had warned you of this curve at the scene of the accident that unless you slackened your speed you would have an accident, what have you to say as to that testimony of his? A. I don't remember him saying that.

"Q. If he had said that would you have slackened your speed? A. Yes, sir.

"Q. Is your hearing good, Mr. Oakley? A. Yes, sir.

"Q. He was sitting right next to you? A. Yes, sir.

"Q. I believe you have testified that you had never been over this road before? A. No, sir.

"Q. Did you know at that time that Mr. Rhodes lived on this road and he had lived in that vicinity ever since you had known him? A. Yes, sir.

"Q. Did you know at this time or right before the accident that Mr. Rhodes was more familiar with that highway than you? A. Yes, sir.

"Q. I will ask you if you were depending to any extent upon Mr. Rhodes in directing you over that highway on the night of the accident? A. No, sir, I wasn't depending upon Mr. Rhodes directing me on the highway at all.

"Q. I mean as to the condition of the highway and where it led to, etc.? A. Not on this exact part of the road, I wasn't depending upon him, no, sir.

"Q. What part of the road were you depending upon him to direct you? A. The road to the Lake where the car was stopped and we got out of the car to look for the still.

"Q. I will ask you this question, if you were depending upon Mr. Rhodes' familiarity with that road as to dangerous points, curves, etc.? A. No, sir.

"Q. But you did know that he was more familiar with the road than you was? A. Yes, sir.

"Q. Was this particular night dark or ordinary dark? A. It was ordinary dark.

"Q. Were the lights on your car in poor or good condition? A. Good condition."

Cross-examination:

"Q. Mr. Oakley, you were not depending upon Mr. Rhodes cautioning you about the road? A. No, sir.

"Q. In other words, you were driving on your own responsibility and own lookout? A. Yes, sir.

"Q. Had full charge of the automobile? A. Yes, sir.

"Q. Depending on your own ability to handle the car?

"Q. Going on your own lookout? A. Yes, sir.

"Q. Now, Mr. Oakley, you have testified in answer to several questions on direct-examination that you don't remember Mr. Rhodes having cautioned you about the condition of the highway—do you now state as a fact and positively that he did not warn you or do you say you do not remember? A. I would think if he had warned me I would have heard him.

"Q. Would you go so far as to say positively that he did not? A. I don't think he did. He could possibly have done it.

"Q. If he did, you just don't remember it? A. No, sir."

The other occupant of the car, Mr. Taylor, who was on the back seat, testified on this point as follows:

"Q. You were on the back seat with Mr. Rhodes and Mr. Oakley on the front seat? A. Yes, sir.

"Q. State if Mr. Rhodes protested against the speed that Mr. Oakley was driving the car. A. If he did, I didn't hear it.

"Q. State if Mr. Rhodes warned Mr. Oakley about the highway and the hills and curves? A. If he did, I didn't hear it.

"Q. Right before the accident and right before you reached this curve where the accident happened, state if Mr. Rhodes warned Mr. Oakley about that particular curve. A. I don't think he did, if he did I didn't hear it.

"Q. If Mr. Rhodes had made such protest and warning would you have heard it in the car? A. I think I would have heard it, I wouldn't be positive that I could have heard him. I was leaning over and we were all talking; if he did I didn't hear it.

"Q. Were you close enough to Mr. Rhodes to hear any such warning if Mr. Oakley had heard such warning? A. Well, I think I could while I won't be positive that he didn't tell him, but I never heard nothing.

"Q. Did you hear him say to slow down, that he was going too fast over that road? A. No, sir.

"Q. Had you ever been over this road before, Mr. Taylor? A. No, sir.

"Q. Now, about how fast was Mr. Oakley driving at the time of the accident or immediately preceding the accident? A. Well, I would think about 40 miles, maybe a little faster, could have been running 45."

From this testimony it is readily seen that the defendants' two witnesses are not willing to swear positively that plaintiff did not give the warning he claims to have given and the preponderance of the testimony is not in defendants' favor on this, point, and the burden which the law places on defendants to prove the contributory negligence with a preponderance of testimony on the part of plaintiff, has not been met. Furthermore, if we should find that plaintiff gave no warning and made no protest, we do not think the plea of contributory negligence would bar his recovery. He was not in the car as a guest; he was not in the car of his own free will, but was there by reason of duress and coercion on the part of the sheriff's department, working in conjunction with the town officers of Gibbsland, and, under these conditions, plaintiff was virtually, if not in fact, a prisoner and any protest or warning on his part as to the manner in which the car should be driven would have been presumptuous indeed. Why plaintiff was being returned to Gibbsland by the deputy sheriffs to again face the sheriff and the Gibbsland town officers after he had failed to lead the deputies to a still, is not difficult to presume. Most certainly, if plaintiff had had his will and wishes carried out, he would have been delivered to his home, several miles south of Gibbsland and in the direction from which the car came on its return trip before the car went into Gibbsland.

█ When one is detained by an officer against his will, he is under arrest and in the custody of said officer. Article 58 of the Code of Criminal Procedure defines "arrest" as follows:

"Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person, whether such restraint be imposed by force or result from the voluntary submission of the person arrested to the custody of the one arresting him, but in neither event shall any person be subjected to any more restraint than is necessary for his arrest and detention."

"Custody," as used above, means to detain one against his will. If his detention be brought about through duress, coercion, or threats by an officer, it amounts to arrest. Fear of imprisonment is sufficient to constitute duress. 13 Corpus Juris 400, § 315.

█ Where one does not willingly submit himself to the orders and control of another, but does so in fear of the consequences which might follow a refusal to submit, which fear was reasonably well grounded by the conduct of the other, he is under arrest. Girlinghouse v. Zwahlen, 3 La. App. 720.

We therefore conclude that defendants have failed to prove the contributory negligence which they pleaded.

█ The record discloses that at the time of the accident, which was about midnight, Deputy Oakley was driving at a rate of speed from 45 to 50 miles an hour over a graveled road with which he was not familiar and over which he had never traveled before; and that upon reaching the crest of a hill or incline in said road, due to a sharp curve in the road just as the decline began, the car went off into a ditch. It is shown that the curve is very sharp and abrupt and, to successfully negotiate it, one must travel not more than 20 or 25 miles per hour. One traveling this road in the direction Mr. Oakley was traveling could not see the curve on the other side of the crest of the incline until the crest was reached, and, under such a condition, it was gross carelessness and negligence for Mr. Oakley to proceed at the speed he was traveling at that point. He could not presume that the road would continue straight and must know that there are likely curves in all country roads and that if there was a curve on the decline, he could not successfully negotiate it at a speed of 45 to 50 miles an hour. The negligence of Mr. Oakley was the sole and proximate cause of the accident and resulting injury to plaintiff. He was acting in his official capacity and performing an official duty at the time; his acts in performing that official duty were official acts and the acts of the sheriff of Bienville parish and for which the sheriff is liable.

The insurance policy issued to the sheriff by the other defendant covers the damage caused by the accident, which was due to the failure of the deputy sheriff to properly execute his duties. It was for this very purpose that the policy of insurance was issued— to cover public liability on the car driven at that time by Mr. Oakley, the deputy. The insurance was to cover damages caused by the car, when improperly or negligently handled. If it had been to cover what defendants term "official acts," it would have been valueless, for a car cannot make a sale, cannot serve a summons or make an arrest, cannot do any of the acts contended for by defendants as being the only acts that are official acts, and, as they contend, are the only acts for which the sheriff can be held liable. Therefore, they contend that, since the sheriff cannot be held liable, neither can

the insurance company. We have found that both are liable in this case.

The car turned over twice and plaintiff was thrown out. He was knocked unconscious. When picked up, he was carried to Dr. Kidd, in Gibbsland, then to a relative's home, and the next morning carried to the Schumpert Sanitarium, in Shreveport. He suffered a gash on his forehead and pains in his chest and stomach. Plaintiff was unable to walk for a period of three weeks; and also suffered a serious and permanent injury to his back which is described by the doctors as a cortical fracture of the eleventh dorsal vertebra, with resulting lipping of the lumbar vertebra and calcification of the lateral ligaments. As a result of the injury, he cannot straighten up and has become stooped. He can do no straining, lifting, or other manual labor which requires exertion. He cannot plow, chop wood, hoe, or any other heavy work on a farm. Plaintiff's vocation is farming and, according to the record, he is a good farmer. He can do the light chores necessary to farming. His back is the source of much pain. Prior to the accident, plaintiff was a strong, healthy man. He is uneducated and relied strictly upon his farming for a livelihood for himself and family. The doctors, in attempting to estimate the percentage of disability plaintiff has, place it from 35 per cent. to 75 per cent. However, this is of little value, as they all agree he is disabled from doing manual labor, as we have stated above.

Plaintiff has suffered a great deal and will continue to suffer. He prayed for $2,000 for pain and suffering. His demand is not unreasonable; and for the permanent disability, we think, an award of $5,000 will do substantial and impartial justice between the parties. Plaintiff has expended $245.85 for doctor's bills, hospital bills, and medicine, which amount he is entitled to recover.

It therefore follows that the judgment of the lower court is reversed and there is now judgment in favor of the plaintiff, A. M. Rhodes, and against the defendants Henderson Jordan, sheriff of Bienville parish, La., and Sun Indemnity Company of New York, N. Y., in solido, in the full sum of $7,245.85, with legal interest thereon from judicial demand until paid and for all costs of both courts.

MILLS, J., dissents as to that part of the judgment holding that plaintiff was acting under duress, being of the opinion that the evidence discloses that he was acting under a promise of immunity from prosecution on charges which had already been filed and under which he admits his guilt.